We'll hear argument first this morning in Case 18-540, Rutledge v. Pharmaceutical Care Management Association. General Brawney? Thank you, Mr. Chief Justice, and may it please the Court. Pharmacy benefit managers are drug middlemen that reimburse pharmacists for the cost of prescription drugs. Those reimbursements are frequently below a pharmacist's cost. That drives pharmacists out of business and has left many communities without a pharmacist. Act 900 responded to that practice by regulating what PBMs pay pharmacists. That response isn't preempted for three reasons. It doesn't regulate benefits, it doesn't regulate plan administration, and it doesn't regulate or discriminate against the risk entities. First, Act 900 does not regulate benefits. Instead, it regulates the price of drugs that a plan has already decided to cover. That's rate regulation, and under Travelers, that's not preempted. And that's because cost differences don't force plans to behave differently in different states and thus don't interfere with uniform administration. Second, ERISA doesn't preempt laws that implement or enforce rate regulation. Indeed, absent enforcement, there is no regulation. And Respondent doesn't dispute that Act 900's enforcement mechanisms implement Arkansas' rate regulation. Nor, for that matter, do those mechanisms regulate plan administration. Rather, they regulate PBM reimbursement practices, and plans don't control those practices. Instead, those practices are governed by PBM pharmacy contracts that aren't even shared with plans. And it, therefore, defies common sense to suggest that Act 900 regulates plan administration. There is no connection with problem. Third, Act 900 does not refer to ERISA. Under Dillingham, only laws that treat ERISA plans differently contain a prohibited reference and are preempted. Respondent doesn't even attempt to argue that's true here. Nor could it, since Act 900 applies to PBMs that work for both ERISA and non-ERISA entities. This court should reverse the judgment below. Counsel, your basic point, it seems to me, is that the law regulates drug prices. That's certainly the purpose of it. But it doesn't say anything about drug prices. Instead, it talks about what plans have to pay for benefits, the methodology of determining the amount to be paid, the timing and procedures for updating payment schedules, the dispute resolution processes, remedies, it has things like the authorizing declining to dispense. I mean, at the end of the day, all this might have an impact on drug prices. But it seems to me that it's very different. And those differences really do go to what ERISA is trying to regulate. Well, Your Honor, I think at the end of the day, the one thing that affects plans, and in fact the only way in which our law actually affects plans is it might alter what plans ultimately pay. Our law does not apply directly to plans. Our law is directed at PBMs and what PBMs pay pharmacies. So in that sense, the only effect on a plan or the only effect that a plan might see might be the possibility that at the end of the day it might pay a little bit more. But that's the same thing that was true in travelers. In travelers, when New York regulated what commercial insurers were paying hospitals with the surcharges, this court acknowledged that the odds were that those surcharges would be passed on to the plans, and that might affect how the benefits package is that the plans might choose to offer. It might influence the choice of administrator. But what the court emphasized is at the end of the day that that's just cost, and it might influence shopping decisions. But ultimately what's important is it's not dictating substantive plan decision-making. And the same thing is true here. We haven't dictated how plans resolve anything. We haven't dictated plan decision-making about what to provide or how to provide it or anything like that. All of the mechanisms that Your Honor referred to really are mechanisms that are PBM mechanisms. The plans don't have any insight into any of that stuff. And, again, from a plan's perspective, the only impact would be on prices just like it was true in travelers. Thank you, counsel. Justice Thomas? Following up on the Chief Justice's question, it seems that if the pharmacy wins its appeal that it has to rebuild, and it seems that then it determines when the copay determination is made final. So that seems to be something, the copay determination, that you would normally expect the plan to decide. So isn't that something central to the plan? Your Honor, it actually doesn't affect things like copay. In fact, copay would be a flat fee, for instance, that the beneficiary would pay. And the only adjustment that's made as a result of a reimbursement appeal, which, by the way, happens now, the only adjustment that's made as a result of that would be the adjustment of what the PBM owes to the pharmacy. I don't disagree, Your Honor, that in a small number of cases, there might be some downstream impact on what the beneficiary owes. In a copay situation, which is 81 percent of situations, that's not true because the copay is a flat fee, and that's never going to change. But in those cases where we're talking about something like a high deductible plan or a coinsurance plan, there might be an effect downstream on the dollar amount that the beneficiary pays. But what's important from an ERISA perspective is that what the plan promised the beneficiary, which is the applicable rate of coverage, which is the coinsurance rate, or you will get your drug minus this copayment, none of that changes. Act 900 doesn't impact any of that, and that really underscores that we haven't regulated central plan administration. The same thing would be true, frankly, today. Drug prices float up and down. They represent that they are continuously adjusting the MAC list every day to reflect market prices. So that means that today a beneficiary who's under, let's say, a coinsurance plan, might pay one price for a drug at the counter and might pay something else the next day just because the price has changed it, but it doesn't mean that the benefit has changed because the benefit is not the MAC price. The benefit is what the plan ultimately promises. Thank you. Justice Breyer? In a state where every plan that pays for health is an ERISA plan, suppose the state passes a law like 900 or simply, more simply, passes a law that says all insurance plans must pay druggists at least X, or no insurance plan can pay more than Y or something like that. I'm regulating the price that they're going to have to pay the plan. State A, all the plans and only the plans are ERISA plans. State B, none of the plans are ERISA plans. And state C is Arkansas, where I don't know what the percentages are, but you can tell me. Does that matter? It doesn't, Your Honor, because what Arkansas' law actually regulates here is the price that the PBM pays the pharmacy, and because what we're not talking about here is it's not a matter of central plan administration, as this court explained in Travelers, the amount that a service provider is paid. It really doesn't matter at the end of the day whether the law applied to PBMs. In other words, it doesn't matter what the scenario is. Okay. Well, imagine what the law says in state A, where every insurance plan is an ERISA plan. Every ERISA plan in this state must pay a druggist for aspirin no more, no less than $3.20. Preempted? Again, Your Honor, because it's regulated. Because every ERISA plan must do that, and that's what they're... Well, if it specifically refers to ERISA plans... No, it doesn't. It just says a plan of type A, which all happen to be ERISA plans. I guess it would depend on the scenario, but if it were exclusively an application to ERISA plans as a result of they're the only ones who fit the definition, then, Your Honor, we would potentially have a reference to problem, but, again, that's not the issue here because our law doesn't apply exclusively to ERISA plans. And what's the precedent? So I'm not... The record doesn't reflect what the percentage is that's backed ultimately by an ERISA plan, but we do know that it's not all of them. In fact, PCMA brought a Medicare Part D claim and was able to prevail on that claim in the Eighth Circuit, which would underscore that they're not all ERISA plans. Also, there are people who purchase commercial insurance on the ACA Exchange in Arkansas, and obviously a PBM that works for a commercial insurer that was purchased under the ACA Exchange would also be covered by our law. Thank you, counsel. Justice Alito? What we have to do in this case is to interpret and apply a federal statute, and what that statute says is that it preempts, quote, Today, when we interpret statutes, what we generally do is to ask what the language would have been understood to mean at the time of enactment, and we have moved away from interpreting statutes in light of the purposes that they are thought to serve. So if we were to take that approach here, wouldn't that lead to the conclusion that this law is preempted? No, Your Honor, because when Congress used the phrase relate to, it could not possibly have meant anything and everything that possibly relates in some sense to an ERISA plan. I think, as Justice Scalia famously explained, joined by Justice Ginsburg, that if every curbstone philosopher knows, everything is ultimately related to everything else, and that really means there would be no limiting principle, and that would present serious constitutional concerns. So I think, given that, what this Court has historically done when it's had language that's as broad as that that would present problems or as broad as it is here, it looks to the overall structure of the statute, so the overall purposes of ERISA, what is ERISA concerned with, what is it specifically addressed, and what do we know are Congress's goals based on the statute? Well, that is an interpretation. That is the purpose of interpretation, and maybe we don't have an alternative, but if we follow the way we generally interpret statutes in this case, you would be in a lot of trouble, wouldn't you? I don't think so, Your Honor, because I think, ultimately, at the end of the day, you have to interpret that language in light of the remainder of ERISA and what ERISA actually is concerned with, which is the planned beneficiary relationship and the things that are specifically listed in ERISA that are designed to ensure benefits are more secure, and Act 900 in no way regulates the planned beneficiary relationship. Thank you, Counsel. Justice Sotomayor? Counsel, I want to follow up a little bit on Justice Breyer's question. What I am interested in is a different scenario than this law, but if we rule in your favor, I'm not sure what the distinguishing factor might be between this law and between your law and the hypothetical I'm going to pose. Let's say a state decides we're going to have three tiers of drugs. For Tier A, the plan is everybody's going to pay. All PPMs are going to pay $100. For Tier B drugs, $200. And for Tier C drugs, $1,000. And let's say a plan or let's say just about every plan decides that the price of Tier C drugs was so high that the plan simply could not afford to provide those drugs to its participants. That is affecting the beneficiaries and what they get. And it's affecting at least for those who are not on fixed co-pays but on percentage co-pays. Your fixed ones I'm assuming is when you pay $5, $10, $15, or $20 for each drug as opposed to one that says we'll pay 80% and you pay 20. Beneficiaries are being directly affected and plans are being affected quite directly because they're being blocked out of any market whatsoever for a cheaper drug. Why wouldn't that second scenario be preempted? As a broad principle, the same rule generally would apply, which is that costs merely influence a decision and that's not sufficient for preemption. But what I would add is the scenario I think Your Honor is posing would be addressable under what Travelers said, that if you had a rate regulation that it was in fact so onerous that it dictated substantive plan decision-making, sort of the scenario Your Honor has posed where it's $1,000 for a drug, if it's true that that's in fact so onerous that it's dictating the terms of the substantive decision-making of the plan, who's a beneficiary, what's covered, it's that kind of law, then that could be preempted under Travelers. Travelers left open that possibility to ensure things like that didn't happen. But that's not this case. This case, obviously, they haven't made an argument that our drug regulation is so onerous that it would dictate their substantive decision-making. Thank you, Counsel. Justice Kagan? General, I had understood the argument in your briefs to extend further than the SG's argument. The SG spends a good deal of time talking about the distinction between regulating PBMs and regulating plans. So if the plan managed prescription drug benefits itself, the SG says that would be a different question and we shouldn't reach that question. I had thought that your argument really made that distinction irrelevant. But when you answered the Chief's question, you said, well, our law is directed to PBMs, not plans. So I guess what I want to ask you is, were we to rule in your favor, should we write an opinion that really makes that critical or should we write an opinion that makes it essentially irrelevant? I think the easier approach, Your Honor, would essentially be that this case is basically travelers. Because in travelers, it was the commercial insurers that were being charged the surcharges. And the way the court analyzed it was to say that the only potential impact on the plans was it might potentially be passed along to the plans and that might influence decisions. That same framework applies here because the rate regulation applies to the PBM paying the pharmacy and it's possible that the plans, not required, but it's possible the plans might choose to, or the PBMs might choose to pass that on to the plan. So I think the court could resolve this case entirely on that basis. My point, however, was that at the end of the day, I guess it really doesn't, it wouldn't make a substantive difference in a lot of cases. It's just that this one, it illustrates the point that this case looks exactly like travelers. Thank you, General. Justice Gorsuch? Counsel, your friends on the other side are going to argue that this case is less like travelers than it is like, I think you pronounced it Govielle, but you can tell me, where Vermont tried to regulate reporting requirements for all kinds of healthcare plans, including ERISA plans, and that it just incidentally affected ERISA plans. Of course, we held that preempted there, and counsel's going to get up and tell us that this is exactly like that case. We're very close to it because it affects drug prices all healthcare plans have to pay. Would you care to respond to that now? Sure, Your Honor. This case is very different from Gobey, and I think the critical difference is that Gobey ultimately was about a statute that regulated a fundamental ERISA function. I think the language this court used was that it was a direct regulation of a fundamental ERISA function, which is recordkeeping and reporting that's specifically listed and detailed in ERISA, and the Department of Labor has additional power to issue additional regulations under. And because that was a specific ERISA function that's specifically listed in ERISA, what this court said is that Congress couldn't regulate it. I guess my question, counsel, is if reporting relates to health plans, why wouldn't the payment for drugs? That would seem to be one of the central functions of the healthcare plan. I would agree with that, Your Honor, but I think the difference is that in Gobey, Congress specifically spoke and imposed specific requirements for reporting and recordkeeping. There are no ERISA provisions that govern a dispute between what a third-party administrator pays a service provider or even what a plan would pay a service provider. Instead, those things are generally left to the states to regulate, and, in fact, the PBM pharmacy contract, for instance, those are ordinary state law contracts that are ordinarily subject to state law enforcement mechanisms. Thank you, counsel. Justice Kavanaugh? Thank you, Chief Justice, and good morning, General Brani. Picking up on questions Justice Alito and Justice Sotomayor asked, the other side argues that Act 900 will have a clear negative effect on plan beneficiaries who are Arkansas workers and that, if so, it must relate to ERISA plans. Do you agree or disagree with the premise that this will have an effect on plan beneficiaries? I disagree with that, Your Honor. Can you explain that? Ultimately, what we've regulated is, again, the price that the PBM pays the pharmacy, and what we're talking about that's being regulated there really is the margin. We're requiring, I guess you could say, PBMs to reallocate some of that margin back to the local pharmacies in order to ensure that they can remain in business, and so that small-town independent rural pharmacies across our state, people in those communities retain access to pharmacies, because when a small-town pharmacy closes in Hampton or Gillette, Arkansas, it might be 30 miles to get drugs. It might be 30 miles to get an immunization, so we're protecting those individuals in those communities. But I also think that the decision by the PBM, there's no requirement that the PBM pass on any cost increases that might come along with that to the plan. That's entirely up to the PBM's business decision. It can decide not to pass those along, and if their representations below that they compete competitively based on price is true, then it may be true that some PBMs choose to pass on those costs, some do not. But ultimately, that's up to the PBMs. That's not a product of anything that Arkansas has done, and it might influence plan decision-making, but you can't guarantee that that's going to be the case any more than that was the case in Travelers. Thank you. Counsel, why don't you take a minute to wrap up? Thank you, Mr. Chief Justice. At the end of the day, ERISA doesn't preempt state rate regulation, and Act 900 is state rate regulation. Indeed, to put an even finer point on it, this case is Travelers. All the provisions at issue here regulate rates, or at a minimum, they all implement or enforce Arkansas' rate regulation, and Respondent doesn't dispute that. And to the extent that Respondent relies on the complexity of the PBM pharmacy reimbursement process, that also doesn't change the analysis. Indeed, to the extent that process is complex, it's not a result of Arkansas' rate regulation, but how PBMs have chosen to structure the market. It's the PBMs that develop the system that uses continuously updated MAC lists and reimbursement appeals to set prices. And all that Arkansas has done is impose a rate regulatory rule of decision on top of the system that the PBMs themselves designed. And for the same reason that New York's rate regulatory rule of decision wasn't preempted in Travelers, Arkansas' isn't preempted here. Thank you, Mr. Chief Justice. Thank you, Counsel. Mr. Liu? Mr. Chief Justice, and may it please the Court, the key question in this case is whether the Arkansas law directly regulates the central matter of plant administration. If it does, then the law has an impermissible connection with the ERISA plan. If it does not, then there is no impermissible connection and no ERISA preemption. Here, the Arkansas law directly regulates the relationship between PBMs and pharmacies, namely the PBMs' method of reimbursing pharmacies for prescription drugs. So the question becomes, is pharmacy reimbursement a central matter of plant administration? The answer is no. From the plan's perspective, pharmacy reimbursement is simply a matter of cost. And as this Court's decision in Travelers and DiBuono made clear, cost isn't a central matter of plant administration. Indeed, in Travelers, this Court upheld a state law that regulated the method for reimbursing hospitals. The state law here, which regulates the method for reimbursing pharmacies, can't be distinguished. The Court of Appeals' judgment should therefore be reversed. Counsel, I want to focus. I think it's on the same question that Justice Kagan asked your friend. Much of your brief focuses on the fact that the regulation here is directed to a third party rather than a plan. And then at the very end, I think you say, well, it doesn't really make that much of a difference. So is your approach focusing on who is being regulated or what is being regulated? It is focused on what is being regulated. As I said at the outset, our test is does the state law directly regulate a central matter of plant administration? Now, you're right, Mr. Chief Justice, that we devoted a portion of our brief to refuting what we understood to be respondents' only way of distinguishing travelers, which was to say that the law in Travelers fell on insurers and not plans themselves, whereas the law here does. And our response to that argument was twofold. First, to say that that's just a misreading of the state law here. It doesn't apply directly to plans. But more importantly, secondly, that even if it did, it wouldn't matter because at the end of the day, pharmacy reimbursement just isn't a central matter of plant administration. Thank you, Counsel. Justice Thomas? Chief, I have no questions. He addressed my concerns. Justice Breyer? The same. I have no addition. Thank you. Justice Alito? No. Justices Scalia and Ginsburg suggested that it would be preferable if we reformulated our jurisprudence on ERISA preemption and asked whether a state law fell within the field that ERISA preempts. Do you recommend that we take that approach? Would it work? I think it would work, Justice Alito. We have no objection at all if the court took a more text-based approach to ERISA preemption. If you look at page 1A of the statutory appendix of the Blue Brief, you'll see the text of the preemption provision. And I think the key language here is actually not relates to. If you look at the text, it says, the provisions of this subchapter and subchapter 3 shall supersede any and all state laws insofar as they may now or hereafter relate to any employment benefit plan. The operative language is actually what comes before the supersede. The provisions of this subchapter and subchapter 3 shall supersede. The relates to language, I think, just makes clear that when a law falls within the field described by the language before supersede, you don't strike down the entire law, but rather you strike it down only as applied. In other words, as it relates to any ERISA benefit plan. How would you define the field? The field would be defined by the text of the preemption clause. So the provisions of this subchapter and subchapter 3, that's the field that the text marks out. And I think tellingly, there's really no way a responder can prevail under that text because there's no provision in this subchapter or subchapter 3 that speaks to pharmacy reimbursement rates. This is a huge contrast with the Govay case, where there's an entire part of the ERISA statute that addresses the reporting and disclosure of plan information. So if the court were to take a more text-based approach, I think that's an even steeper hill for respondents to climb. Well, what you've just mentioned sounds more like conflict preemption to me than field preemption. Did I misunderstand what you said? No, I think the provisions of this subchapter and subchapter 3 mark out the field. There may be cases, as was the case in Govay, where the state law reporting requirements were actually consistent with and supplemented the federal regime. So you wouldn't have, strictly speaking, any conflict preemption, but we would still say that the state law fell within the field occupied by, quote, the provisions of this subchapter and subchapter 3. Thank you. Justice Sotomayor? Counsel, what benefits would exist by our resolving the theoretical disputes among our colleagues? Because Justice Alito pointed to Justice Scalia and Ginsburg's views, but there were others expressed by many of my colleagues. And a number of amici point out that despite the differences, the outcomes would still remain the same. So is there a reason why we should go down one path now as opposed to another? I don't think there's a strong reason to do so here, Justice Sotomayor, because we think this is a pretty straightforward case, even under existing precedent. If you look at all the cases this court has found of state law that have an impermissible connection with the risk of plans, there are eight of them. Seven involve state laws regulating the plan, participant, or beneficiary relationship, regulating what health care services are covered, who counts as a beneficiary, how benefits are calculated, and how participants can enforce their own rights under the plan. Then there was an eighth case, Gobey, which involved a function that ERISA itself addressed. This case falls within neither of those categories. It's not a case involving a state law regulating the plan, participant, or beneficiary relationship, and it's not a state law that regulates a function that ERISA specifically addresses. So even if this court were to leave its existing precedent in place, we think this is a pretty straightforward case. Thank you, counsel. Justice Kagan? Mr. Lew, one of the main drivers of ERISA's preemption provision was a concern about uniformity. And here we have 45 different states that have passed all kinds of laws with respect to these PBMs, and I'm wondering why that doesn't raise exactly the specter that the drafters of ERISA were concerned about, where the PBMs are trying to do 45 different things in 45 different states in a way that really does affect plan administration. Well, Justice Kagan, this court recognized in Eaglehawk on page 150 that all state laws create some potential for the lack of uniformity. And so the question has to be, is the lack of uniformity in an area that ERISA cares about? I think this just goes back to the question I set forth at the outset. If the law regulates a central matter of plan administration, then that's an area that ERISA cares about, and disuniformity in that area is going to be a good reason for ERISA preemption. But if we're talking about an area of traditional state regulation that is beyond any central matter of plan administration, I think those uniformity concerns go away. If it were otherwise, you know, preemption would seriously run its course, as I think this court has said. All state laws carry the potential for uniformity. If pointed to this uniformity were enough, all state laws would preempt it. I do want to add, though, that this isn't, you know, when we talk about PBM pharmacy reimbursement, it's not like this was an area that was marked by pristine uniformity. You know, whether there's preemption here or not, there's going to be a lack of uniformity in cost. And that's by design. As the record shows, Joint Appendix Pages 320 and 321, PBMs maintain hundreds of MAC lists, varying by plan, coverage, and pharmacy. So, yes, if there's no preemption here, it's going to add one more variable to that list. But PBMs already tailor their MAC lists to a lot of different variables. Thank you. Justice Gorsuch? No questions. Thank you. Justice Kavanaugh? Thank you, Mr. Chief Justice, and good morning, Mr. Liu. You said at the outset that cost is not a central matter of plan administration. And I think when you zoom out, that statement suggests something's gone awry here in the jurisprudence, because cost will directly affect the benefits paid to beneficiaries. And the goal of ERISA, after all, was to protect American workers, including, it would seem, against state regulation that would perhaps favor state businesses over state workers. So why shouldn't ERISA care about costs that are going to be increased and thereby passed on in the form of lower benefits or worse benefits to, here, Arkansas workers? Well, I think Travelers already answered this question. We had the same issue in Travelers, as the Court recognized on Page 659. And the surcharges there are going to be passed along to plans and their beneficiaries eventually. And I think the reason why Travelers didn't think that was enough to trigger ERISA preemption was because increased costs actually don't affect the basic bargain between the plans on the one hand and the participants and the beneficiaries on the other. I totally agree that ERISA was enacted to protect that relationship. But increased costs don't affect the terms of that relationship. You take the example of the coinsurance. Yes, it's true that if costs go up, the dollar and cents amount you'd have to pay in coinsurance would go up, too. But that was also true in Travelers. I mean, the very first line of Travelers said that the surcharges were assessed on the patients themselves. So the idea that there might be some cost-sharing arrangement between the patients there and the insurers was right before the Court, and it didn't make a difference. I think you have to ask in all these cases, what is being regulated? And if it's not the plan participant relationship itself, which I agree is central to what ERISA cares about, then there is no preemption. Thank you. Mr. Liu, you have some time left. Why don't you take up to three minutes? Thank you. Well, I just want to address some of the questions that came up. I think, you know, Mr. Chief Justice, you asked about whether this is different from a rate regulation, and I think it's important to emphasize that all the provisions here do form a package. They're all an aid of the same goal, which is regulating rates. I mean, just think about the regime in Travelers. The regime in Travelers is actually more onerous than the regime here, because there the state, in a pretty heavy-handed way, was dictating exactly what the hospitals had to be reimbursed. It was a DRG rate plus a certain surcharge. What Arkansas has done here is actually more market-based and more flexible. Instead of saying every time prescription X is filled, you must pay X amount of dollars, it's saying what the reimbursement amount is can vary from pharmacy to pharmacy depending on the pharmacy's acquisition cost. And the way to make that market-based approach work is to create a mechanism where the PBMs and the pharmacies can work out the reimbursement rate. That is a less restrictive approach than the regime that was before this court in Travelers. And I think it would be strange if a less restrictive approach was found to have a greater connection with the RISA plan. I'd also add that Travelers rejected any distinction between a purely economic rate regulation and regulations that may affect procedures. Red Travelers itself discussed quality standards and workplace regulations. Such laws would surely have an effect on a PBM's procedures. But the court went out of its way to say, look, we can't draw any principled line between rate regulation on the one hand and all sorts of other laws on the other that have an effect on cost. I guess I'd just like to end by emphasizing that Travelers really does decide this case by making clear that how a provider is reimbursed is not a central matter of plan administration. Respondent attempts to distinguish Travelers, but each of those arguments is answered by Travelers itself. And really what Respondent's argument amounts to is a request that this court cut back on or overrule Travelers. This court should reject that request, which would remove one of the few principled limits on a RISA preemption, expand the scope of its preemption clause to its broadest point ever, and open the door to all sorts of new RISA preemption plans. Thank you, Counsel. Thank you, Counsel. Mr. Waxman. Mr. Chief Justice, and may it please the court, Act 900 directly compels RISA plan administrators to comply with state-specific rules and procedures in administering their benefits programs. In doing so, it adds to a thicket of varying state laws that make uniform plan administration impossible. Now, Arkansas says it can dictate how plans should be administered as a means of so-called rate regulation, but state regulation of RISA plans as a means to some other end, whether it's rate regulation or otherwise, has never been permitted. None of the cases Arkansas or the SG cites involve laws directing plan administrators to do anything. Extending those holdings to a law like this, which directly regulates plan administration, would breach a critical line. Travelers neither dictate nor even suggest otherwise. The law there regulated a health care provider by requiring it to impose a surcharge on patients. As this court explained, and as reiterated in heck verba in Dillingham, the New York law, quote, did not bind plan administrators to any particular choice and thus function as a regulation of the RISA plan itself. Nor did the indirect influence of the surcharge preclude uniformed administration or provision of a uniform interstate benefit package, close quote. Act 900 does bind plan administrators to particular choices. And in the welter of varying state laws makes uniform national plan administration impossible. Preemption applies whether the plan administers the benefits itself or as most are required to do, engages a PBM to do so on its behalf. This court has never distinguished between plan administration and third party administration. That distinction made no difference in Gobe and it would have destructive effects on the foundational purpose of ERISA. The main effect of the state law here is on what pharmacists get for selling drugs. And it's also the clear purpose of the law. Why don't, shouldn't we look at that underlying reality rather than the mechanics that the state imposes to achieve it? Mr. Chief Justice, I think the answer is no. And I think the question that you asked my friend, General Brawny, provides the answer. You can look in, it would be one thing if Arkansas said that pharmacies, you know, may or must receive X number of dollars for Y drugs. If that were what the law said, and this is in many, many ways not, whether or not it would be preempted would require this court to decide the two questions that it reserved in Travelers itself. The first, which is the last sentence of footnote four, explained that the court did not address the surcharge statute insofar as it applied to self-insured plans. And the second, as my friend mentioned, is that if the state law produced economic effects as to force the ERISA plan to adopt a certain scheme of coverage, it would indeed be preempted. Well, it's not the state or the pharmacy's fault that the PBMs have such Byzantine procedures that affect drug prices. Nobody is saying that it's anybody's fault. The fact of the matter is that if you look through Act 900, you will look in vain to find a single substantive provision that just says pharmacies can charge this amount. So what the Act does is essentially four things. It requires regular updates to MAC lists on a formula that is almost impossible to comply with, but in the context of 40 other states which have different schedules, different triggers. Counsel, you've got one out of four in. Could you very briefly just say what the other three are? Yes, the varying different appealed procedures with different rules of decision, a widely varying set of remedies that plan administrators have to provide, and of course the various states with different decline to dispense provisions which directly deprive beneficiaries of a promised benefit. And it's all of those procedures that go to what is indeed a central matter of plan administration and certainly makes it impossible to have a nationally uniform plan administration. Counsel, I'm sorry I was looking at the wrong time allocation. We have a little more time. The PBMs really do two things. The first is set the cost of pharmacies, and the state says that's not regulated. But the second is to determine coverage. I mean, that's not preempted, but the second is to determine coverage, which they say is. Anything wrong with looking at it that way? Well, I think it oversimplifies it to the point of distortion. This is directed at plans and plan administrators that use MAC lists as part of their methodology for determining what benefits will be provided to which employees for which drugs in which pharmacies. And it's the interference with the application of that methodology upon which the entire plan is designed that makes this so preempted. If I may just refer the court to the court's opinion, and this is Egelhoff quoting Ford Halifax, quote, state regulations affecting an ERISA plan system for providing processing claims and paying benefits impose precisely the burden that ERISA preemption was intended to avoid. Justice Thomas? Thank you, Chief Justice. Mr. Waxman, I was intrigued by Mr. Liu's answer to Justice Kagan's question about uniformity. Would you take some time? He seemed to suggest that it's just one more item of disuniformity and or lack of uniformity. And I'd like you to comment on his answer. It's somewhat at length, if you don't mind. Certainly. First, I commend the court to the amicus brief filed by J.B. Hunt Company, which is an Arkansas employer that employs drivers all over the country. It has a pretty good explication of how impossible uniform plan administration would be. But just to reiterate and expand a little bit on the four points that I identified for the Chief Justice. So Arkansas requires regular updates to a MAC list according to a sort of Byzantine schedule. There are 40 other states that require updates, but on different schedules with different triggers for updates and different substantive requirements for the updates. So plans have to have different state by state MAC lists. There are 37 states, including Arkansas, that require appeal procedures. But they are all different. Eight states specify the particular rule of decision, as Arkansas does. But they imply different standards and with different effects. And so multi-state plan standards and procedures for appeals will vary state by state. Third, the remedies following the appeal procedure vary widely. Some states require revisions to the MAC list. Some states require notice to other pharmacies. Some states, like Arkansas, allow the pharmacy to reverse and rebuild. But other states allow all pharmacies that paid that MAC price to reverse and rebuild. There are four states, including Arkansas, that have declined to dispense provisions. But they have different conditions for declining. And so employees of the same company will have unequal benefits from state to state. Thank you. Justice Breyer? Thank you, Mr. Waxman. I'd like your views on a more general question. The words here in the statute are relate to. Everything does relate to everything else. So what kind of relate to? And obviously the court struggled with that. What about state setting prices? High prices or low prices? Of hospital services. Of pencils. Of orange juice. They all relate to costs. So we've got out of that one by saying, well, even the hospital services. Even that. Raising prices isn't a close enough relation. That's interesting. Now you put that on. You've taken an aspect of that. You said, well, no, it's the procedures that you use in order to decide what the prices are. That's the problem. But every form of rate regulation involves procedures. They all do. And therefore, we're going to get into the same business. How much procedure is too much? How much is too little? What kind of procedures? Wouldn't it be simpler to read that word relate to that? We'd have to go back on language and say what it means is ordinary. Principles of preemption. They're complicated enough. And I mean, my goodness, that a special group of words over in the Arisa section just makes it life much more complex. In other words, that's ordinary principles. Why not? So, or is that your. Am I. I want to know what your actual view is on that because we. Several cases. This court has evolved a very particular. And I think in widely applied standard for what relates to me. It says on the one hand, if it refers to and on the other hand, if it is, if it. The concerns and as to the latter, which is what we've been talking about. This court has said it will be preempted if it does either of two things. Either the state law governs a central matter of plan administration. Or it interferes with nationally uniform plan administration. Now, again, I'll just one more sentence to answer your question. The difference isn't how many procedures it dictates or doesn't. The difference, as I pointed out when in quoting both travelers and Dillingham is whether or not the law is directed at plan administrators or directed at third parties. And in, in the, in this case, if the test is whether or not it by quote binds plan administrators to any particular choice, and thus functions as a regulation of the ERISA plan itself. That is that that is the very characterization of what this law does. It binds ERISA plans to any number of choices, which I articulated. So does price fixing. So does price fixing. So does, in fact, any system of regulating to apply prices. So, you know, price, price fixing is the subject of another federal statute and ERISA plans. I don't think that there is an exemption from the Sherman Act or the Clayton Act. Forget that question because I don't have time and I can't be clear enough. Go ahead. I see your point. Justice Alito. Mr. Waxman, you were stressing how complicated it would be for a, for PBMs to comply with laws like the Arkansas law and similar laws in all the states. But it struck me that what they do, even without a law like Arkansas is extremely complicated. And it requires, I'm sure, pretty complicated computer programs. And that's why apparently there are so few of these PBMs. It requires a pretty sophisticated entity to deal with this situation at all. So in light of that, why would it be so difficult and costly and burdensome for the PBMs to deal with a variety of different state laws? Well, you're quite right, Justice Alito, that, you know, as the D.C. Circuit pointed out in its PCMA decision, which both parties, all parties are citing, the complexity of providing American workers with pharmacy benefit is tremendous. And that's why, as a practical matter, they have to use third party administrators to do this. The fact that they have third party administrators which allow them to provide these kind of benefits on a price efficient basis doesn't mean that ERISA permits every individual state to add additional levels of complexity. And if you just look at just the requirements for the 40 different tests and schedules for updating MAC lists and what price consequences to plans and beneficiaries every update to the MAC list has, it's an immense complication and it affects the benefits that beneficiaries receive. And similarly, the remedies that vary from one state or other imposing on plans that very often are national plans mean that employees of the same company will have unequal benefits from one state to another and plans will have to have either plans themselves or using the third party administrators that they have appointed as agents to administer the plan on their behalf, different procedures and different remedies and different update schedules in every different state which themselves frequently change. And many, many of these requirements will turn, will require the plans to either change their summary plan of benefits, their explanation of benefits when it turns out that the beneficiary has to pay more in Mississippi because of some requirement that applies after an appeal procedure, or to tell people, for example, look, you're a driver for J.B. Hunt, but if you try to fill your prescription in Arkansas, even though we have promised you that you can fill that prescription at this pharmacy with this coinsurance or copay obligation, you have to understand that that pharmacy has the right to refuse to give you that benefit. And you said that these laws affect the benefits that employees get, but do we know whether that is in fact true? Do we know, assuming that they increase the cost for the PBMs, do we know that, how much of that increase in cost is passed on to plans and beneficiaries and how much is absorbed by the PBMs? So we don't have specific data on this, but we know the following. First of all, as I think both of my friends on the other side acknowledged, you know, one way or the other, in the very short term or the long term, this is going to cost plans more to administer and therefore is going to affect the munificence of the benefits, the pharmacy benefits that plans feel that they can afford. Second of all, in terms of the decline to dispense provision, that is an immediate and obvious derogation of the beneficiaries' promised rights under the plan. Thank you. Thank you, Mr. Weiss. Justice Sotomayor? Counsel, following up a little bit on Justice Alito's question and turning it a bit on its head, the SG had made an awful lot in his brief about the fact that this enforcement mechanism fell on the PBMs rather than the plan. But as was pointed out in Gobel, we came to a different conclusion on the reporting requirement. But would a ruling in this case in favor of petitioners have plans reconsider whether they're going to use PBMs at all? Could they reconsider it if they thought this was just too onerous? I think as a practical matter, yes, they definitely would reconsider. And I think that points out the reason why in Gobel the court found complete of no moment whatsoever that the Vermont state law in Gobel didn't even apply to the plan or the plan sponsor. If it wasn't for the fact that they used a third-party administrator, the law would have no application to them. And the reason for that is that, I mean, just look what would happen if all of these state laws applying all these procedures and substantive rules applied to national plans. All right. So, counsel, I'm sorry to interrupt you, but we do have limited time. What I want to do is let's simplify the law. Anyone who pays pharmacies, whether it's PBMs or the plans themselves, but anyone has to do the pricing in this way. And they don't differentiate between plans. They don't differentiate between being a PBM or not or a non-ERISA plan or not. They just say pharmacies have to be paid at cost plus or whatever, at minimum, okay? How would their arguments change and how would your arguments change? So, I think if the law simply said pharmacies can charge X price for Y drugs. Exactly. That would be the situation in travelers. But unlike the situation in travelers, which addressed a charge placed on patients, which then had implications for insurance companies, not ERISA plans, that type of law would implicate the questions reserved in note four and Roman numeral three of travelers. But this law, as I think we've talked about, doesn't do that. It doesn't direct. It isn't directed at pharmacies. It's directed at plan administrators. And it doesn't just apply a price standard. It prohibits the use of a methodology that the plans have adopted in order to figure out what benefits they can provide at which pharmacies for which drugs. And it lays on multiple procedures that they have to follow. And those additional costs, both in terms of reimbursement obligations and plan administration, would manifestly affect how munificent the pharmacy benefits that a plan could offer would be. Thank you, counsel. Justice Kagan? Mr. Waksman, both your friends on the other side place a great deal of emphasis on the distinction between claims processing and, on the other hand, the reimbursement process. And they say, basically, if you look at our cases, in particular travelers, we have made that distinction time and time again, that the reimbursement process is a process that involves the relationship between the plan and the provider. And ERISA preemption doesn't care about that. The only thing ERISA preemption cares about is the relationship between the plan and the beneficiary, such as in the claims processing sphere. So why isn't that the way to look at this? So I think, you know, this court has said, has acknowledged in many cases, and I gave you the quote from Egelhoff in Fort Halifax, that how plans manage, calculate, and pay for benefits and how sponsors design plans is the central matter of ERISA plan administration. And it is important, it is critical that this court maintain the line, that it is always maintained, between the potential preemption of a law that is directed at third-party providers of health benefits, as was the case in travelers, on the one hand, and, as this court pointed out, underscored in travelers in Dillingham, a law that, quote, binds administrators to particular choices, and thus functions as a regulation of the plan itself. And that's the distinction we're asking this court to adhere to. I'm sorry, did I answer your question? Hello? Justice Gorsuch. Good morning, Mr. Waxman. Good morning, Justice Gorsuch. If ERISA preempts the law here, should we worry that it also preempts other sorts of general regulations about other kinds of benefits?  Some plans, of course, provide daycare benefits, debt benefits, all sorts of other kinds of benefits. Where would you have us draw the line if preemption occurs here? Why not there? Yeah, I think I'm going to give you a variant of the answer that I just gave Justice Kagan. A state law that says, okay, you know, childcare providers, nursery schools, and daycare providers have to follow all the following safety procedures, which makes it more expensive, they have to charge plans more. That's travelers. That is a state obligation or a state regulation imposed on somebody who is providing healthcare or life care products or services. And the fact that, you know, some hospitals charge more than other hospitals has been thought, at least in the travelers context, subject to the two reserve questions in travelers, not to implicate preemption. But when the state law says to the plan and the plan administrators, you know, if you're providing death benefits, you have to use the following procedures, and you have to update these lists, and you have to allocate benefits between the plan and the plan beneficiary, and you have to let the plan beneficiary know that some funeral homes may refuse the services that we have assured you they will provide under the contract terms, that would be preempted. Okay. Along similar but different lines, what do we do with the fact that there are plenty of ERISA plans that operate without pharmacy benefit managers? There are plenty of pharmacy benefit managers that provide services to non-ERISA plans. And, of course, your clients here are, as I understand it, all pharmacy benefit managers and no ERISA plans. We don't have an ERISA plan that's actually complaining about this before us. As I understand it. Yes, that's right. I mean, there are amicus briefs filed by sponsors of ERISA plans, but the plaintiff in this case, and therefore the respondent here, is the pharmacy benefit manager association. First of all, I would say that it is important to underscore, as everybody recognizes, that well over 95% of ERISA plans are, in fact, required in order to provide this otherwise expensive benefit to use third-party administrators. And a rule that distinguished between the application, depending on whether you use this third-party administrator, would have very grievous effects on the ERISA plan's willingness to provide this benefit, which, of course, is directed at the single most expensive aspect of the healthcare services. And so I don't know if I've answered your question. I may have talked myself through remembering what the question was, but if I haven't, please give me another chance. Thank you, counsel. Justice Kavanaugh. Thank you, Chief Justice, and welcome, Mr. Waxman. Thank you. The basic music or theme from the other side, as I understand it, is that ERISA focuses on the relationship between plans and beneficiaries and is not as concerned about the economic relationship between plans and pharmacies or healthcare providers, even though, as Justice Breyer rightly said, state laws affecting that relationship would undoubtedly affect benefits. What's wrong with that picture that the other side has drawn, if I have it correct? So I think that what's wrong with it is that it misunderstands the direct regulatory effect that the Arkansas law has on the plans, the design of the plan, and how plans go about managing, calculating, and paying for benefits. And that's the problem here. It's the fact that the law is directed at plan administration and, in fact, directed at, in this regard, as, again, to quote this court, the plan system for processing claims and paying benefits. I mean, the Act 900 dictates detailed terms on which PBMs, on behalf of plans, are allowed to design and manage networks and reimbursement systems in a nationally uniformed way. And that is the ERISA, the Section 514a vice. And a wrap-up question. How would you have us write the opinion with respect to travelers? Obviously, the other side has put heavy emphasis on travelers. And you would say travelers does not apply here and does not control here because, and I'll just leave you to fill in the blank there. So, you know, travelers does not apply here because, by its terms, travelers was predicated on the correct conclusion that the New York surcharge law, which required hospitals to impose certain charges on patients, quote, did not bind plan administrators to any particular choice and thus function as a regulation of the ERISA plan itself, nor did the indirect influence of the surcharge preclude uniform administrative practice or the provision of a uniform interstate benefit package. And those two aspects of the plan in travelers and this court's decision in travelers and Dillingham provide the very distinction that ought to be underscored here, I respectfully suggest. Thank you, Mr. Waxman. Thank you, counsel. We have several minutes left if any of the justices have further questions. Okay, if not, Mr. Waxman, why don't you take up to three minutes? Thank you, Mr. Chief Justice. I don't, I think I've pretty much covered what I wanted to say. I think that the, because Act 900 makes uniform plan administration impossible, and because it directly binds plan administrators to particular choices and thus functions as a regulation of the ERISA plan itself, it lies in the heartland of what Section 514A sought to protect. And for that reason, the judgment should be affirmed. If I could, Mr. Waxman, you've used that terminology quite a bit, binding administrators to particular choices. And I guess I would just like to understand particularly what you mean by that. Which choices does it bind administrators to and how? Well, thank you, Justice Kagan. It binds them, number one, to not use the methodology that is reflected in the MAC list upon which the plan's benefits and scope have been predicated. It binds them to a particular schedule of updating MAC lists that varies widely across the country. It binds them to a particular appellate process with a particular rule of decision that varies widely across the country. It binds them to apply particular remedies in the event that the appellate process satisfies the rule of decision. And it binds them to inform their beneficiaries that notwithstanding the promise that the beneficiary can go to Pharmacy X and receive Drug Y with the following coinsurance terms, in fact, the pharmacy now has the right under state law to deprive the beneficiary of that promised benefit. Thank you. Thank you, counsel. Mr. Brawny, you have three minutes for rebuttal. Thank you, Mr. Chief Justice. I think what I'd like to start with is perhaps clarifying my answer to a question that Justice Kagan asked me, which is about really where the focus of our argument is. And it's the same as the government. Really, our point is that Act 900 doesn't regulate central plan administration. And to pick up on Mr. Waxman's last answer, when the court talks about central plan administration and binding plans to things, really what it's talking about is binding plans to decisions about who's a beneficiary, what's the benefit, what's the degree of coverage, that's the copay, coinsurance rate, et cetera, and how those things are determined. It's not rates. It's not what a third-party administrator pays for a service provider. And the fact that that's what we're talking about here really makes this case exactly like Travelers and makes this an easier case because Travelers has already addressed that issue. In terms of attempting to distinguish Travelers, what I understand Mr. Waxman to be saying is, well, it's somehow different because somebody different is being regulated or the rate regulation is being applied somewhere else. But in reality, in Travelers, the surcharges were paid based on the commercial insurer that was being used. If you were using a non-blue, you paid the surcharges. Here, it's the same principle. If you're using a PBM, the PBM uses a MAC list, you pay these rates. So they're really not distinguishable. On the uniformity point, really, I don't see a lot of – there's a lot more uniformity than disuniformity here. But at the end of the day, what's most relevant is that it's not disuniformity with respect to core plan administration, and Mr. Waxman didn't point to any disuniformity with respect to core plan administration. And this court has never said that disuniformity in the abstract is a problem, because obviously that can't be true because ERISA wasn't intended to create an entirely isolated or insulated universe immune from ordinary state market regulation. Another point that came up was the decline to dispense provision. Frankly, that's inherent in rate regulation, as we explained in the brief, but it also operates like any number of other ordinary state regulations that even PCMA doesn't claim are preempted. Like, for instance, in Arkansas, a pharmacist who has a moral objection to prescribing a particular medication may decline to dispense that medication, and even PCMA doesn't claim that those laws would be preempted, even though it would have the same effect. And lastly, to end on a question that Justice Gorsuch asked, which is about the limiting principle. I think that's really the problem with PCMA's argument. There's no limiting principle. If you accept their position that cost, anytime a regulation imposes cost, that can lead to preemption because it might affect the benefits calculation. That really has no limiting principle. It would, frankly, preempt things like state minimum wage laws that have exactly that same effect. So we would ask that this court reverse the judgment below. Thank you, counsel. The case is submitted.